21-50352 King v. Baylor University Good morning, Your Honors. May it please the Court. The rules and principles that courts have developed to interpret and enforce contracts have survived more than two centuries of crisis and rapid changes to society in this country. They survived COVID-19 too. Under those rules, Ms. King has stated a claim for relief. Now, Your Honors, before diving into my more specific arguments, I want to just take a moment to recognize that the pandemic has been a terrible situation for everyone. And without a doubt, it has put educational institutions like Baylor in dire straits. Your client is screwed. Baylor made a bunch of money. We know that. Just get to the law. Absolutely, Your Honor. So, I just want to touch on three key points in the time that I have today. The first point, I want to talk about the Financial Responsibility Agreement, or the FRA, because that was central to the District Court's decision. Second, I'd like to talk about the Pandemic Liability Protection Act, or the PLPA, which went into effect during the pendency of this appeal. And third, time permitting, I'd like to touch briefly upon the Education of Malpractice Doctrine. Turning first to the FRA, Your Honors, Texas law is clear that a written instrument must be interpreted according to its plain language and in consideration of the document as a whole. In light of that, I want to make two textual and structural points on the FRA. The first one is structural. And this is a little bit of a fundamental observation, Your Honors. You know, the parties devoted a great deal of time in their briefing to talking about issues like whether the FRA is sufficiently definite under, you know, as a stand-alone contract, whether it incorporates enough terms to save it as a stand-alone contract, and other issues like that. But Your Honors, just stepping back for a moment, those issues only crop up if you interpret the FRA as the sort of be-all and end-all fully integrated contractual relationship between the parties. Our position is that the FRA is not that. It is just one piece of the larger contractual puzzle between the parties. What's the biggest other piece? Because I would have thought it would be the catalog, but you don't dispute the catalog says it's not an enforceable contract. What's the biggest other piece for this multifaceted contract? Your Honors, there are several other pieces. I know it's the biggest. Yes, Your Honor. I think the biggest one probably is the fact that, as we've alleged, that there are separate application processes for the in-person instructional programs. In addition to that, there are many statements that we have alleged in our complaint that talk about the promise of and the benefits of an in-person educational experience as opposed to an online experience. And then also, Your Honors, as Baylor showed in its declaration in support of its motion to dismiss, that when a student registers for courses on BearWeb, which is their registration portal, those classes are distinguished between online and in-person. So all throughout the parties' course of dealing, there is a clear distinction between online. Are there undergraduate online classes? Yes, Your Honor. There are some. I mean, I saw what was in your brief, but they drew the for your client, and therefore they're not comparable. Yes, Your Honor. That's a question of fact, but we clearly allege that there is a separate online program for undergraduate students as well. And so, based upon all that course of dealing, Your Honors, we think none of these problems arise with the FRA if you view it that way, as one piece of the larger puzzle and not the puzzle itself. When we look at the FRA, where can we look that would tell us that it's not the sole contract and that we should look to course of dealing or other implied promises? Well, Your Honor, I don't think it expressly says that, but what I think it does is that structurally, it makes clear that it's not meant to be the whole agreement between the parties. It's a three-page document written in the first-person perspective of Ms. King, and it deals almost exclusively with her responsibilities regarding finances and payment. And so, in light of that, we think the structure clearly indicates there has to be more than that. And Your Honors, you know, talking about the term educational services, we briefed that a lot in our briefing. I think that becomes less problematic under this reading of the FRA, because the party's course of dealing, these other documents, and their communications with each other help inform and give color to the term educational services and make that term more specific. You know, I want you to get to all three of your points, but as you know, there are many district court opinions that address this issue around the country, and I'm curious at some point if you tell me which ones you think most strongly support your position in this case, because they're obviously different aspects of state law, they're different contractual provisions, they're different kinds of disclaimers, and I just, I've read a lot of them, I just wanted to know which one, if any, you think directly supports your view. Absolutely, Your Honor. I think the one that I would point to you most is one that we mentioned in our supplemental authority letter, which is the Fiore v. Tampa University case, because that, that case dealt with a lot of similar issues, and it also had a financial responsibility agreement in that case, and that also talked, it had sort of a similar closet issue there, so I would advise you to take a look at that case. Have any of the cases, there are a lot of tuition refund cases, have any of it gotten to a circuit level? Not that I'm aware, Your Honor, this is the first one. We're charting new, new territory here. You said you had two points about the F.R.A., F.R.A. being one piece of a multi-part contract. One of that was the distinction of online and non-online, the other was what, the series of representations about the Baylor experience, is that right? Your Honor, if I understand your question, that's correct. Those are the different pieces of the puzzle that make up. We see them again, What were the two? Sorry, what were the two points? Let me just, let me just step back and I'll just say all the points, you know, that we've alleged in our complaint that make up the representations here. The first is the representations that Baylor puts out on its website and in documents like its catalog. The second set of communications is the separate online and in-person application process. The third one is the, the distinction between Baylor and BaerWeb. Are you relying on the catalog despite the disclaimer in the catalog? No, your Honor. I think it's important to step back and look at how we, what we did with the catalog and our allegations. We mentioned catalogs only twice in the complaint, paragraph ninety-four and paragraph one hundred and one. And both times what we said is simply that the catalogs, in those catalogs, Baylor distinguishes in-person and online courses and clearly markets them as a distinct product. So we're not saying that the contract, or pardon me, that the catalog itself is the contract. We're just saying that that is one piece of the course of dealing between the parties that we believe if we get passed a motion to dismiss, we'll make clear that the agreement was for separate. Your client is not contending, I believe, that she didn't take classes. Is that correct? That's correct, your Honor. She, she was given online courses. What, what, both sides of this case trouble me, but from your client, well, and also housing charge, was she an on-campus student? Yes, she was, your Honor. She had enrolled in an on-campus program. So did the twenty-one thousand dollars cover her dorm cost? Where was her, her dorm cost is not mentioned in your complaint, right? Your Honor, I would have to look into the record because we don't plead that in the complaint exactly what, with respect to her housing situation. Well, maybe that was refunded. I don't know, but it said you're seeking the tuition, you see, and of course she only got a partial credit on dining and then twenty-six hundred on the student fees activity. That's correct, your Honor. I don't, I'm not, I don't believe that she was living in on-campus housing. I, I can't say that for sure because we didn't allege that. It's not in the record, but regardless, you know, the, the refunds. Well, what, what, you know, I was trying to think about this in terms of services contract. They say this is an integrated contract because it refers generically to educational services, but of course if you consider the amount of tuition and you consider the hours in class and then you consider everything that Baylor offers, including, you know, multiple baseball, multiple basketball courts, the largest rock climbing wall in a college, the opportunities for Christian ministry, music, free game tickets, and so on. I mean, educational services is, seems more capacious than merely the classes that one enrolls in, but how can we personalize that to each student's expectations as to what the services will comprise? Your Honor, I don't think you have to make an individualized determination there. I think you can just leave it at, at saying, look, Baylor markets and prices separately online programs as compared to in-person programs. Students who choose to pay more and pay additional fees for in-person educational experiences would reasonably have the intent to receive that different experience than an online experience where they were doing education remotely. So I don't think you need to parse sort of individual expectations in that regard. Well, but suppose this student, for instance, were only interested in, let's say, student government and free game tickets. Then a lot of the other activities, a plethora of activities, would be irrelevant to that student, but you're saying, so the activity fee is supposed to cover those extrinsic non-class room things. Is that right? That's correct, Your Honor. I mean, those fees are mandatory for students enrolled in the in-person program, and so even if a student may not take advantage of those services, they had to pay those fees to obtain the benefits of, of those fees. And so That would be the minimum amount that your client would be entitled to. Well, yes, Your Honor. I think they'd be entitled to a refund of whatever fees they paid that were explicitly marked for in-person activities and, and amenities the university offered. Well, that's $2,600 maximum. Well, that may be the case, Your Honor, and we're certainly not, you know, abandoning our tuition claim. We think the tuition claim is equally viable, but, you know, that's one important point about the whole FRA. All the briefing is mostly talking about the difference in courses, but the FRA really doesn't address fees as well. Is there an hourly breakdown? In other words, if a, if a student takes 10 hours versus 18 hours in a semester, is, does tuition adjust according to the number of hours they sign up for? Oh, Your Honor, I don't think that's in the record yet, but I believe that there is a difference based upon the amount of hours that... And what about the online classes? Is it just, if you sign up for English 3, is that the $1,000 if it were online, or is that on an hourly, is it $1,000 an hour? What, how does that work, or does it? Oh, Your Honor, I'm not sure yet. We would have to look into that further into discovery. What I can say is from our, you know, what we allege in our complaint is that the price is markedly lower for online courses, um, per credit hour. And then finally, if, if one were to, uh, get into this, how would, how would one calculate damages without backing right into the educational malpractice concerns that courts have expressed? Absolutely, Your Honor. So I think that the key thing which we mentioned in our brief is that, you know, at the pleading stage, we are not required to put forth a damages model. Um, and I would refer you to the case of Bowen versus Robinson, where the, uh, Texas Appeals Court said to state a contract claim under Texas law, a party is not required to plead his measure of damages, nor allege the applicable legal measure of damages. But I think... No, no litigation came into our circuit after Katrina. There's nothing helpful? Uh, not that I'm aware as far as, uh, educational. I guess, I mean, then if there isn't any case law, I'm thinking of a limiting principle. In other words, let's say you go to Baylor, you're a science student, and then you get there in the semester, and the, the lab buildings flood out. Is the logic of your position then, if they say, okay, you need, you know, you're going to have to go online for two months? Well, I think, Your Honor, if, if... Magistrate said, tornadoes, floods, influenza. Put aside pandemic. Influenza. There are lots of reasons schools have to shut down. Students do online. They do what's best. There's a strike. You've got to go to the professor's house. What, each, each of those would be possible implied breaches? Your Honor, I believe they may be. I think it would depend on the facts of the case and depend on what the promises were that were made. Um, but I think in a case like this where a school had promised specific in-person and charged fees for in-person activities in all courses... They all do, right. Um... Well, I've read in some of the, I'm sorry, go ahead. No, no. No, that's it. Go ahead. I've read in some of the district court cases that there are specific disclaimers that make specific reference to things like, uh, disease, public health, uh, reserving the rights to the university and its discretion to say suspend classes or do things like that. Uh, certainly colleges can contract for these things. They're easy to foresee. Uh, they've been foreseen for years. So my question then, is there any specific disclaimer like that in this case, uh, that's very specific as to public health or disease? Oh, no, Your Honor. There is no such disclaimer. But I would simply point out that that disclaimer could easily be put in a contract. And that... Well, it's called force majeure. Absolutely, Your Honor. And there was nothing of that sort here. And so... Well, except for the fact that the catalog description in more than one place says this is not a contract. This is not an offer for a contract. We, um, we, uh, reserve the right to withdraw courses at any time or change fees, tuition rules, calendar, curricula, degree programs, and any other requirement affecting students. Changes will become effective at the time the proper authorities so determine. Absolutely, Your Honor. I see my time has expired. May I briefly answer? Yes, please comment on that. Certainly. Just two quick points on that. First, um, as I mentioned, you know, we're not saying that the catalog is the governing document here. So even if that's the case and the catalog says that, that doesn't address the promises that were made outside of the catalog. Second point is that even if that disclaimer somehow applied to the entire relationship between the parties, I would simply point the court to, um, the case that we cited in Waldrop versus Waldrop. Um, now that's a case, it was a dissent where the court was talking about the legal standard on lack of mutuality of consideration. And it cited a case called Enree 24R Incorporated. That is a Texas Supreme Court case where the court said a promise is illusory if it does not bind the promisor such as when the promisor retains the option to discontinue performance. And so, Your Honor, I think that's directly on point. If that were, if that disclaimer gave Baylor the right to terminate or modify courses unilaterally without any, um, controlling circumstances, then that is, um, unenforceable for lack of consideration. Thank you, Your Honors. All right. So you have a chance for rebuttal, Mr. Hawkins. It's one thing, Mr. Hawkins, to be a good advocate. It's another thing to claim that a well-run Zoom class is fully comparable to in-person learning. Thank you, Judge Jones. May it please the Court. To pick up on that point, Your Honor, I think that a university could decide in its best judgment consistent with its pedagogical mission that there are benefits to online learning that are not present in in-person learning. The world has been doing online for nearly, God forbid, two years now, and nobody takes the position that it is fully comparable to in-person, whether it's court hearings or business meetings or learning. So just, I'm just caution that you, lest you overstate Baylor's position. Yes, Judge Jones. I don't want to overstate Baylor's position, but I think your comment picks up on an important mistake that Ms. King is making, which is that I think she's offering this Court an improper competitor. She's suggesting that in-person learning in a bucolic, disease-free environment is superior to learning online at home. That, of course, is not the reality in March of 2020. The proper competitor at that point is being in a classroom surrounded by other students who may be carrying a deadly infectious disease, perhaps being so distracted that you might catch this disease that you might not even go to class in the first place. You might just sit it out, or if you do go to class, you may be so concerned about your health that it impedes your ability to learn. I think that's the proper comparator, and that's what Ms. King doesn't seem to acknowledge. She seems to be picturing some perfect scenario, which is just not the case. That's an excellent argument, but I'm not sure that it goes to whether there has been argument for no breach of that contract, or a good argument to mitigate damages if the plaintiff won. But I thought we were here to talk about whether they had plausibly stated an implied contract in their complaint, and whether it should be instead, as the District Court did, dismissed as a matter of law. Right, Judge Shunkin. Thank you. I agree that's why we're here, and so let me address that express written contract. It's fully integrated, and it's unambiguous, and that's the FRA. The FRA precludes the existence of any implied contract, and I would note this is responsive to a question that you asked earlier, Judge Duncan, where in the FRA it says to look to other materials. It doesn't. It's got a merger clause. Well, you agree yourself that it cross-references the other information for the billing, the amount of tuition, and the term of the agreement. Well, I think it functions as a typical click-wrap agreement that courts around the country uphold all the time in the commerce age. Correct. And the open-ended portion of this FRA, it defines educational services, and educational services, as represented by Baylor, in many, many, many communications with the to receive knowledge, to grow spiritually, and to become a leader, and that's the educational service, and that may, that in, to me, that, and the fact that there are other contracts that talk about services does not mean that this is a, a full definition of what's encompassed here. Well, Your Honor, I think the Texas cases are on our side here. I mean, we've discussed a page . . . No, they're not, because you don't list a single one that's educational services, right? Well, I've got the State Farm Lloyds case, Judge Jones, which is an even broader term. In that case, the state appellate courts upheld the term professional services, which is even broader than educational . . . State Farm? State Farm Lloyds case. It's on page 30, uh, 32 of our brief. And what, what kind of professional services were, were being rendered there? Uh, it, it dealt with the insurance industry. I acknowledge it's not in the educational context, but I think that from the context here, educational services is certainly definite enough. I mean, everyone in this relationship knows how college works. You've got an instructor, you've got students, there's the convenience . . . Well, after, according to the FRA, if you don't withdraw from a course, uh, before the first day of the course, uh, then the teacher can show up once during the semester, and you have to pay your full tuition for one day of class for the entire semester. Is that the way Baylor interprets their, their, uh, latitude of educational services? Well, Your Honor, the . . . Is there no, is there functionally no, no such thing as a breach as long as Baylor declares that's our educational services? Of course not, Judge Jones. And I, if we were to continue this colloquy, I will stipulate now that we could reach a point at which we would both agree that a university has acted so patently unreasonably that it cannot possibly be thought of as having provided educational services. But the critical thing in this case is that Ms. King admits that she got educational services. Her whole theory is that Baylor irrevocably promised to provide in-person educational services no matter the circumstances. Yes, but then again, but then you're evading what educational services entails. Well, Your Honor, I, I think educational services, as I mentioned a minute ago, is understood to everybody in this relationship. Texas, the way Texas courts . . . Then why does Baylor build the tallest rock climbing wall in, in colleges? Well, Your Honor, it's, it's part of creating a rich, vibrant campus life. Exactly. And why does Baylor spend money so that people can have free tickets to the athletic games? And why does Baylor sponsor intramural sports, which I assume entails some level of, those are all within the realm of educational services as defined by Baylor. Right. And the critical thing, Judge Jones, is that nobody reasonably understands educational services to mean in-person learning no matter what other circumstances. Is that, is that a matter of law and for plausibility or is that a matter for further factual development? I think that's a core equal . . . And let me tell you what I was thinking about in this regard because you say services, well, that's generic and everybody knows what it means. Well, you're in an environment that is not a competitive environment. If I am the mother of a bride and I buy floral services for the wedding and I'm saying I pay X amount and I want best possible flowers and then the florist comes up with a bunch of wilting old flowers the day before the service and says, here you are, then I, that is a breach of that contract because nobody, in a competitive environment, everybody has a, what do you say, a rational, factual basis to compare floral services at X amount of services or not that way? Well, Your Honor, let, let me try it this way. In order to conclude that the term is ambiguous, under Texas law, it needs two reasonably possible definitions. Now, the definition she's offered for educational services is that it means in-person instruction all the time no matter what. That cannot possibly be right and therefore that's not a reasonable interpretation and it can't possibly be right for at least a couple reasons. Number one, that's inconsistent with the plain language of the contract. Nobody understands educational services to mean in-person no matter what. Number two, it would lead to the exact type of absurd results that Judge Higginson was noting earlier. I mean, suppose, for example, Baylor were to encounter an active shooter on campus one morning and announced that, you know, as a result that afternoon, all the classes... I mean, Baylor could have put a force majeure clause in the contract. Well, Your Honor, Baylor's got a disclaimer in the course catalog acknowledging that it has, that it reserves the right. They claim that they're not content in the course catalog, which is very definitive about that. Your Honor, their complaint tells a different story. As counsel acknowledged, the complaint does point to the course catalog as part of the universe that's part of the implied contract. Well, I think it's part of the universe. I'm just saying it's not, it's the Milky Way. It's not the universe. Well, Your Honor, they can't simply exclude the course catalog at oral argument after they've decided that the disclaimer is actually harmful to their case. I mean, they've pointed to all these materials and said this is part of the implied contract, and our response is, I guess, two things. Number one, that implied contract includes a robust disclaimer. And number two, even if it didn't, and this is one point that makes this case different from all of those other cases that Judge Duncan was mentioning earlier, Texas law in the Southwell and the Pacheco cases acknowledge as a matter of academic freedom, which according to the Supreme Court flows from First Amendment principles, that universities retain discretion to modify their courses of instruction except where they've expressly promised not to do so. But those were academic standards cases, weren't they? They weren't tuition cases. Well, I don't know those cases involve tuition refunds, but I don't think it matters. The law in Texas is that, I'm sorry, Judge Higginson. Well, I just had just two questions, but I know you're answering a lot of questions. It would help me when you say these other cases, is that your answer particularly, I didn't read them all, Delaware and the Tampa, the Delaware Judge Bevis and then the Tampa Fiore case, is your, you answer those saying those are, they're wrong, in other words, the FRA is a single entire integrated contract, or they turn on state law distinctions? It varies from case to case. Those two, just those two. Yeah, so, Your Honor, I think that to the extent that the Fiore case is looking at a similar FRA and saying that that's not integrated, I do think that's wrong. But I would like to point out that to the extent universities are losing around the country, and many of them have won, but to the extent they're losing, I think they're suffering from four core problems. And we see this in the Loyola case, which the Seventh Circuit heard argument on quite recently. You'll get to the Delaware case, right? Yeah, sure. The common theme that we'll see in these cases is that, number one, there's either no express explicit contract or the university is not alleging that there's an express explicit contract. That's not the case here. We've got the FRA. Number two, there are different pricing for different types of undergraduate education. That came up a lot in the oral argument in the Seventh Circuit. Loyola charges a different amount for online undergraduate classes than it does for in-person. Now, that's a critical distinction here because Baylor doesn't do that. Now, in paragraph 53 of the operative complaint, they point out the MBA program charges different amounts for their online program versus their on-campus residential program. But Ms. King is not a graduate student. She has no standing to pursue the claims of graduate students. We don't have a... Well, but again, everybody understands... Everybody knows online is not the same as in-person. I'm sorry, but everybody knows that after two years of intimate experience. Well, but to the point in their complaint, though, Baylor charges the same amount for undergraduate classes, whether they're online or in-person. We pointed that out in our MTD. It's also... They reallege that in their blue brief. In our red brief at footnote 12, we pointed out that that's wrong. They haven't acknowledged that that's just not correct. That came up a lot, though, in the Loyola case. Point three? Point three, we've got the Southwell and the Pacheco cases. This is the point arising under Texas law, and I think that's how I'd write off the Delaware case as well. We have discretion under these cases to change our practices, except where we've expressly promised not to do so. Now, in our... I'm sorry. Well, I don't remember. I want you to make your fourth point, but then I want to pick up on that third point that you just made. Sure. So, my fourth point is going to be the disclaimer. So, it's undisputed that we've got that disclaimer in our course catalog. In the Loyola case, the Seventh Circuit noted there's a fact dispute, and that case is not decided, to be clear. But just an oral argument, the Seventh Circuit noted there's a fact dispute over whether, in fact, there was a disclaimer. Let's assume that the FRA is the only contract we need to be concerned about, and you say that there's a capacious definition of educational services under Texas law. Now, a hypothetical student enrolls at Baylor. One semester in, Baylor decides, you know, we've seen this University of Phoenix thing. We think this is a wonderful model. We're going to change to the University of Phoenix, and it's going to be totally online. Does Baylor have the discretion under the FRA to do that without breaching the contract? So, Judge Duncan, let me answer that hypothetical, and then I'd like permission to fight that hypothetical. Oh, absolutely. To answer that hypothetical, I do think that that would not be a breach of contract. I think that is providing educational services, as everybody understood. And as I started out by saying to Judge Jones, I think that a university might conclude that there are benefits to online learning that are not present in classroom learning. I mean, if the professor writes the equation on the board too quickly, you can pause, rewind, slow it down, whatever. You can go pick your kid up. I don't see, frankly, I appreciate the answer, because I don't see how you could answer any differently, given your view of the FRA, that it's that broad. We decide to be University of Phoenix. It's not a breach of contract. Right. So now I'd like to fight that hypothetical, if I may. I think it's very unlikely that a school like Baylor would do that. I mean, the first few paragraphs of the operative complaint note that there is a robust competitive landscape for top student talent. Baylor is not just competing against other schools in the Big 12. It's competing against other schools all over the country, and indeed all over the world, for the best student talent. And that would change its standing in that robust competitive landscape. And so I don't think it's likely that schools would do that. But by that same token, I think it's been understood that schools always retain discretion to adjust to emergencies on the fly in real time. How many colleges and universities adjusted to the circumstances of the pandemic by acknowledging to the students that they had foregone many costs in operating the university during this period and therefore reduced their tuitions? Well, Your Honor, we're stepping outside the record. I don't know of any schools that gave tuition refunds. But the notion that schools somehow reaped a windfall from the pandemic is simply wrong. And I would direct the court to, I think, the very helpful amicus brief filed by the which documents, again, outside the record, the enormous expenses, the billions of dollars that universities around the country spent to procure Zoom licenses, to upgrade their IT services, to make sure that the students have laptops, to make sure that the school worked. None of that was free. It was enormously— Did Baylor give out free laptops? Your Honor, that's not in the record. It's not in the complaint. I do believe that Baylor did go to great lengths. And if we were to get to—I don't think we should get to discovery. Well, never mind. Yes, Judge. So this is—you know, the reason I'm asking about other district courts is we're obviously not bound by them. We're not bound by other circuits. But there's so many of them at the same time. Can you point me to any of those district court cases that have something analogous to the FRA where the district court has said, you know, this is the single integrated contract, and it's really all we need to look at? I just don't remember any of those. Your Honor, as I stand here, I don't want to cite an incorrect case, and there are dozens of them. And I don't want to cite an incorrect one. I don't believe—as I stand here, I don't know of a case where we've got the exact same contractual language and landscape where the district court has cited. There are certainly cases where for a particular kind of claimed fee or cost, the contract with the university says, look, we reserve the discretion to change this, and we're not going to be in breach, I'm paraphrasing, if we change X, Y, or Z. And courts have said, okay, you don't have a claim. It's a matter of law. At the beginning of the Ninavaji case, I thought it was interesting that that case starts out by saying, look, we have—students have contracts with universities all the time, but it's unclear where we can point to the single contract. Instead, it's a multi-part thing. And that's what I struggle with in this case because the FRA, I grant what you say about it, but it also is limited to—it limits itself to the matters described therein. I think the language is limited to the matters described. Yeah, I think that language, Judge Duncan is saying, that this is the full scope of the financial agreement between the student and the university. The student is going to pay us tuition. Your Honor, I want to be clear, though. I do not need to die on the Hill that the FRA is a fully integrated contract. If the court disagrees with me on that, I still think we win for a couple different ways. Number one, I think their implied contract theory is wrong for the reasons that we've been discussing, both because of the disclaimer and because of the Southwell and Pacheco line, which they don't respond to in their reply brief at all. And as a result of that, I think that whichever path the court wants to go down, either one of those— I mean, there certainly could be—if there were—there can be an educational contract, I hope you will agree, that can be implied over a course of dealing, right? Sure. That's Ross v. Creighton. The Seventh Circuit case from 1992 acknowledges that in many schools— the relationship is contractual and it's one of implied contract. We're just saying this one's different because we've got this express clause. But again, if the court disagrees with me, I think we still win. And I think— Well, do you win because there's been no promises that are specific enough to constitute implied contract? That's correct. There's no basis—there's no plausible basis for alleging that Baylor has promised in-person courses no matter what else is going on. There's nothing in the express contract for that. There's nothing in the implied contract for that. No student— Well, they're also making claims with respect to fees and things like that. What about that? What about a chapel fee, for example? Sure, Your Honor. So I guess a couple things about that. Number one, the housing, the dining, the parking fees, those have been rebated to the students, and Ms. King has not contested that. She doesn't mention anything about housing anywhere in the contract. Housing and dining. Those are the two big revenue generators for schools. She got the money back. Well, I mean, the biggest revenue generator is the tuition payment. I know. But other than the tuition, that's usually where schools make their money, is dorms and dining. She doesn't say anything about housing. I'm representing outside the record. We did give housing rebates. She didn't say anything about housing anywhere in her complaint. She does mention the dining. We did rebate that. She mentions parking fees in the abstract. She doesn't say she paid them. But I want to be clear. She has forfeited the right to try to disaggregate tuition and fees at this point. Her objections to the R&R say nothing about that. She cannot now say that she wants to disaggregate tuition and fees without raising that in district court. And, in fact, I don't take her blue brief to be arguing for that. I did not get a chance to touch on the educational malpractice doctrine and the PLPA. I believe those are both independent bases to affirm the judgment below. Unless the Court has questions about those, I would ask that the judgment below be affirmed. Thank you, Your Honor. Two quick points, Your Honors. First, I want to mention the State Farm Lloyds case that Baylor relies upon. I think it's important to understand what was at issue in that case. As Baylor mentioned, the term at issue was professional services. But in the contract, as the Court observed in that case, professional services was defined to specifically include the more definite term of management consulting. And what the Court said was that in that case, the act of screening and hiring employees for an apartment complex clearly fell, unambiguously fell within the definition of management consulting, not within the more general term of professional services. And on that point, I also want to talk about the Clear Creek case, which is another case that Baylor relies upon under Texas law. I want you to make that, but I just want to hear your answer. Baylor says that your complaint doesn't allege that there are different fees charged for online versus in-person classes, pointing to paragraph 53. Do you agree with that? Is that correct? I disagree, Your Honor. I would point you to paragraph 95 of our complaint. In addition to being separately marketed and delineated, these products are priced drastically differently, as described more fully above. It does not limit its allegations to graduate programs and undergraduate programs. It's talking about both. All right. And just the second thing I want to hear your response to is that Baylor relies pretty heavily, it seems to me, on the Southwestern and the Pacheco cases. I may be getting the names wrong. And it says you don't respond to those. Do you have a response to those cases? I do have a response, Your Honor. The Southwell and Pacheco cases, as Judge Jones pointed out, both dealt with academic standards. They didn't deal with tuition and fees. The court was talking about, and I would also point out that in the Southwell case, the parties did not dispute that the catalog was the only governing document between the parties. And in that case, the court said, well, the catalog didn't deal with certain firm academic standards, so you have to presume that the school can make changes when there was no governing requirement in the document that the parties agreed was governing. So I think it's very distinguishable. The other case I want to talk about is the Clear Creek case, which Baylor also cited in its brief. That was a Texas case where the term at issue was restoration services. And I think that is an excellent example of how a term like that can be given a more definite meaning when you bring in the parties' course of dealing and the context of the formation of the contract, because that's what happened there. In that case, a school board had hired a general contractor to repair and restore school buildings that had been damaged by Hurricane Ike. And the court said if you look back at the parties' course of dealing and the history of why this contract was entered, it's clear that restoration services meant the specific services needed to get those buildings back up and running and operational as soon as possible after the hurricane. And so that's what we're saying here. We think educational services, if you bring in the parties' course of dealing here and you bring in the other documents and other communications between the parties, we think we will be able to prove that it's clear that those educational services were meant to be in-person educational services. When you speak of educational services, you're not just talking about a Zoom online English class, right? You're talking about the panoply of the atmospherics and the sports and the ministry and everything, right? Absolutely, Your Honor. We're talking about the mosaic of experiences that make up the in-person educational experience. And the other thing I wanted to mention is I want to talk about very briefly, push back on this point that Baylor says we're arguing that, you know, it's not reasonable to expect in-person classes under any circumstances. Of course, circumstances can change, and there may be circumstances where a school cannot provide in-person courses. That's what happened here because of the pandemic. But what we're saying is that when you do that, you can't retain the benefit of a contract when you don't perform your obligations under that contract. That's black-letter contract law, and that's all we're saying. We're not asking for specific performance here or reliance damages. We're just asking for the difference in price of what Ms. King paid for and what she received. Obviously, the school can make changes, but it can't retain the windfall. And by the way, we believe that we can prove that there was a windfall that Baylor experienced here, but that's a question of fact beyond the bleedings. And so unless you have other questions, I'll rest. Were universities under the PPP federal program? I believe, Your Honor, that's outside the record, but I do believe some universities received assistance under the PPP. Thank you, Your Honor. All right. Thank you both very much. We will stand in recess until 9 o'clock tomorrow morning.